ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
Michael A. Geibelson (CA State Bar No. 179970)
2049 Century Park East, Suite 3400
Los Angeles, CA 90067-3208
Tel: 310-552-0130
Facsimile: 310-229-5800
E-mail: mageibelson@rkmc.com

Ronald J. Schutz (*Admitted pro hac vice*)
Cyrus A. Morton (*Admitted pro hac vice*)
Patrick M. Arenz (*Admitted pro hac vice*)
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Tel: 612-349-8500
Facsimile: 612-339-4181
E-mail: rjschutz@rkmc.com
E-mail: camorton@rkmc.com
E-mail: pmarenz@rkmc.com

Attorneys for Defendant
DRAEGER SAFETY INC.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| SPERIAN RESPIRATORY PROTECTION USA, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>DRAEGER SAFETY, INC. a Delaware corporation,<br><br>Defendant. | Case No. SACV08-01010 AG (MLGx)<br><br>**AFFIDAVIT OF JAMES S. JOHNSON** |

I James S. Johnson, Ph.D., state as follows:

1. I am a certified industrial hygienist (CIH) and have spent my career at Lawrence Livermore National Laboratory (LLNL) working as a scientist and manager on safety issues in hazardous work environments including fire fighting. A true and correct copy of my curriculum vitae is attached as Exhibit 1. I retired in 2006 but I am currently maintaining my association

Case No. SACV08-01010 AG (MLGx)
80747913.2

AFFIDAVIT OF JAMES S. JOHNSON

1 with LLNL by participating as their representative on the National Fire Protection Committees, Technical Correlating Committee on Fire and Emergency Services Protective Clothing and Equipment, and the Technical Committee on Respiratory Protection.

2. Throughout my career at LLNL I worked with the LLNL Fire Department on a variety of technical tasks and research projects. In general, these activities focused on improving firefighter safety by improving the equipment they wore and used. For instance, in the early 1980s I was requested to have my group evaluate a new CAL-OSHA (NFPA) requirement for monitoring firefighter movement during all firefighting operations. A variety of commercially available personal alert safety system (PASS) equipment was available for purchase. The PASS products were separate self-contained devices that were attached to the firefighter, normally somewhere on the self-contained breathing apparatus (SCBA) harness. The primary, and really only, function of any PASS is to alert others if the user becomes immobilized or incapacitated. A number of these PASS devices were purchased and evaluated using a series of laboratory tests that were developed to simulate NFPA performance requirements. Product performance problems were identified with duration (battery life), durability, water leakage, thermal resistance and alarm sound levels. At the end of this study the results were provided to the LLNL Fire Chief to aid him in the evaluation of these products for use at LLNL.

3. In another project I developed a device to monitor carbon monoxide gas in portable breathing air distribution manifolds. This device consisted of a carbon monoxide monitor, warning beacon light and audible alarm to warn the respirator users of a carbon monoxide hazard. Other projects I directed have resulted in the development of a high performance breathing machine and a flame and heat test apparatus that are or were used to certify NFPA SCBA.

4. I have been involved with NFPA firefighter standards development since the mid 1980s, initially as a member of the subcommittee on SCBA. After a major committee reorganization in 1995, I became a member of the NFPA Technical Committee on Respiratory Protection and Personal Alarm Equipment, and the NFPA Technical Correlating Committee on Fire and Emergency Services Protective Clothing and Equipment. The 1998 edition of the 1982

standard on PASS was revised and approved by these two committees. I am still today involved with the approval process of PASS standards as a member of the Correlating Committee.

5. The design of PASS devices has evolved from user experience and performance over the last 30 years. The performance requirements of these devices were defined in the various editions of the NFPA 1982 Standard on Personal Alert Safety Systems (PASS). Initially, 1983 Edition PASS devices were based on a completely stand-alone design that required them to be attached to the SCBA or to some other part of the firefighter's clothing. The 1993 edition introduced 3rd party certification to improve the quality and consistency of PASS products. The PASS was still manually turned on by the firefighter when responding to a fire. Serious firefighter incidents and deaths where observed when the PASS was not activated, pointing to a problem with the current performance standard. In the 1998 Edition the design requirement for automatic activation of integrated PASS devices was added. Thus, when a firefighter turned the SCBA on, the PASS automatically activated. The committee made this change to address the issue of firefighters not activating their PASS. In the 2007 Edition performance requirements were added or revised to address temperature performance of the audible alarm, water leakage, transportation issues with and alarm muffling.

6. There have been five editions of the NFPA 1982 standard over the past 26 years. The first three Editions, 1983, 1988 and 1993 of the standard resulted in PASS products that were added on to the SCBA or other parts of the firefighters' clothing, the first-generation design. These devices were usually the size of a walkie-talkie and could be clipped or snapped onto a firefighter or equipment. The fourth Edition of the standard issued in 1998 added the performance requirement of automatic activation of the PASS that resulted in a second-generation design of products. This performance requirement also accelerated the incorporation of the PASS into the design of the SCBA as demonstrated by the PASS being turned on by adding a pressure activated switch in the breathing air supply system or a mechanical switch in the belt buckle of the SCBA. These devices were typically still hung on the SCBA at a convenient place. Most second-generation PASS devices remained generally self-contained in their own case, and they all

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

included a motion sensor, signal processing circuits, audible alarm, warning lights, a panic button for manual activation, and electrical power (replaceable battery).

7.  The 5th Edition of the standard issued in 2007 has resulted in the PASS being further integrated or incorporated into the SCBA, especially in the electronic support and monitoring system (heads up display, HUD) for such things as available breathing air and exterior temperature status and alarms. The change in the PASS water-immersion test to the same requirements as the SCBA also encouraged the design integration between the two systems. These design changes, whether prior to 2007 standard or in response to it, have often resulted in the addition of a central battery power supply, shared containment housings and wiring bundles. In some designs the PASS components have been integrated into other parts of the SCBA and a separate PASS no longer exists. Parts of this third generation design of an integrated PASS and SCBA can be seen in the Scott AirPak 75, Sperian Warrior, and Draeger PSS 7000.

8.  In the second-generation PASS design water leakage was slowly recognized as an issue with many of the available NFPA certified SCBAs. Leakage around the battery replacement cover of the PASS was a problem because of the number of times it was opened and the care that was exercised when it was closed. Leakage from the batter compartment into the electronics was an issue. For instance, there must be wires running from the battery through a hole and into the electronics compartment. If water enters the battery compartment, it can sometimes enter the electronics compartment. Having a separate centralized battery in a secure watertight compartment eliminates this problem.

9.  Survivair was named in two lawsuits involving the deaths of two St Louis firefighters wearing their SCBA, the Panther model. A key point in these cases dealt with water intrusion through the battery compartment. MSA also recognized water infiltration in their PASS devices in 2001 resulting in MSA issuing a User Advisory on the ICM 2000. I do not raise these points to denigrate either company or their products. These examples simply illustrate that the design of the battery component of a PASS is a key consideration for any PASS manufacturer. The option to remove a battery compartment, battery and battery weight from a PASS in new

Case No. SACV08-01010 AG (MLGx)
80747913.2

- 4 -

AFFIDAVIT OF JAMES S. JOHNSON

SCBA designs can be desirable. The centralized battery power supply can be better placed on the SCBA to distribute the weight, and can be more easily designed to be watertight.

## CLAIM TERMS

10. I understand that claim construction is a question of law that will be decided by the Court following briefing and argument by the parties – often called a "Markman" hearing. I further understand that disputed claim terms are to be given the ordinary and customary meaning they would have to a person of ordinary skill in the relevant art at the time of the invention, i.e., as of the effective filing date of the patent application. The '331 patent was filed in September 1999.

11. In this case the relevant art as provided in the '331 patent is the art of safety equipment for fireman and emergency workers in hazardous environments. Ex. 2, p. 34, col. 1, ll. 8-10. A person of ordinary skill in this art is likely to have an engineering or other technical degree, and at least 5 years experience in the industry designing, developing, evaluating, testing or the like, such safety equipment. This should include specifically experience with and understanding of PASS devices and the relevant standards.

12. I further understand that claim terms are to be construed based upon the intrinsic record, namely, the claims themselves, the specification, the file history, and the cited references, as they would be understood by a person of ordinary skill in the art. In addition, other extrinsic sources of evidence that would ordinarily be relied upon by a person of ordinary skill in the art may be considered. This may include evidence concerning scientific principles, the meaning of technical terms, and the state of the art, and may include expert testimony. With these basic principles in mind, I have developed my opinion on the meaning of the disputed claim terms. While I am not a patent attorney, and will ultimately abide by any decision of the Court as to the legal meaning of the claim terms, I am certainly qualified to describe how a person of ordinary skill in the art would, in my opinion, read the claim terms at issue in this case.

13. I have, of course, reviewed the '331 patent, its file history and cited references, along with the documents I reference herein. I have also reviewed the parties' proposed constructions.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

### PASS and R-PASS

14. The term Personal Alert Safety System (PASS) is a term that was known in the art in 1999. There were many companies marketing PASS devices at the time, including the parties to this lawsuit. However, to the best of my knowledge, the term Remote Personal Alert Safety System (R-PASS), was not a term known or used in the art. Based on my experience in the industry and the materials I have reviewed, the term R-PASS was coined by the patent applicants for the '331 patent.

15. When attempting to ascertain the meaning of terms related to PASS technology, a person of ordinary skill in the art would certainly consult the applicable NFPA standards document. The NFPA really guides the industry, in part by guiding the customer requirements. This is because the most current edition of NFPA standards are adopted by a large number of local municipalities, states and federal agencies effectively making NFPA compliance a bid requirement. Thus, in practice, manufacturers cannot compete in the marketplace without a certification that they are NFPA compliant. They must meet or exceed the current standards. Accordingly, a person of ordinary skill in the art would certainly take the relevant NFPA standard into consideration to determine the customary meaning of terminology. In this case, the first NFPA 1982 standard on PASS technology issued in 1983. The fourth edition issued in 1998 and was in effect at the time of the alleged invention.

16. The term PASS was defined by the NFPA at the time as "[d]evices that are certified as being compliant with this standard, that sense movement or lack of movement, and that automatically activate an audible *alarm signal* (which can also be manually activated) to alert and to assist others in locating a fire fighter or emergency services person who is in danger." Ex. 3, p. 47, section 1-3. Notably, NFPA standards and definitions are generally intended to be design independent thereby providing functional performance requirements without restricting manufacturers on the precise implementation. Nevertheless, the NFPA's definition requires the sensing of movement, and automatic and manual activation of an audible alarm signal to alert others and assist them in locating the user of the PASS. This functionality cannot be achieved without some sort of enclosure or housing containing a motion sensor, electronics (circuit board),

1  panic button, sounder (or annunciator) and a battery.

2      17.    The NFPA's definition also incorporates the requirement that a PASS is a device that "is certified as being compliant with this standard." An examination of the certification requirements quickly reveals the key components of a PASS. Under Chapter 4, Design Requirements, the standard has sections pertaining to Mode Selection (off, alarm and sensing modes), Motion Detector, and Signals including Operation Signal, Pre-Alarm Signal, Alarm Signal, and Low Battery Signal. *Id.*, pp. 51-52, sections 4-1, 4-2 and 4-3. Again the same basic components are implicated.

    18.    Regarding the battery in particular, the standard indicates that a PASS in sensing mode "shall emit a recurrent audible *low battery warning signal* when the battery voltage is depleted to the level that will maintain the *alarm signal* level of at least 95 dBA for at least one hour." *Id.*, p. 52, section 4-3.4.1. This is an indication of the importance of the battery for the safety of a fire fighter. Even if the battery will still power a full alarm signal for another hour, that is considered a low battery.

    19.    The battery is emphasized again under General Design Requirements in that "[t]he battery compartment(s) shall be isolated from the operating components so as to prevent damage to the operating components from battery leakage." *Id.*, section 4-4.4. This demonstrates the understanding of a person of ordinary skill in the art at the time that a PASS will include a battery compartment such that battery leakage into the other components of the PASS is possible and must be guarded against. This concept is expanded upon in Appendix A which states, "[r]emoving the battery cover and battery for inspection for water, and performing the extended immersion test with the battery cover removed, provides a test for the isolation requirement between the battery compartment and electronics compartment." *Id.*, p. 69 at A-4-4.4. Again, a PASS clearly has an electronics compartment, a battery compartment and a battery.

    20.    With this general background in mind, I examined the '331 patent. The patent seems to use the word PASS consistent with its commonly known function for monitoring the movement of a safety worker, such as a fireman, and for alerting others. Ex. 2, p. 34, col. 1, l. 60 – col. 2 l. 3. It further describes a PASS with a "housing incorporating PASS 80." *Id.*, p. 35, col.

4, ll. 18-19. The PASS 80 contains, among other things, a motion sensor (mercury tilt switch, *id.*, p. 36, col. 5, ll. 28-32), a panic button or activation switch (*id.*, col. 5, ll. 5-10), a circuit board (*id.*, col. 5, ll. 10-12), LEDs and piezoelectric sounders (*e.g. id.*, col. 5 ll. 37-47), and a "nine volt battery or other suitable power source 200...within the battery case." (*id.*, col. 5, ll. 48-9). As I have stated previously, these are the basic elements of a PASS. *See also,* Ex. 4 (U.S. Patent No. 5,317,305, p. 80, col. 1, ll. 7-14.

21. The '331 patent also describes what I have called a second-generation PASS, that is, a PASS that is integrated with the SCBA only in that it is connected to, in this case, the intermediate pressure hose, such that when the SCBA is activated, the PASS is activated. Figures 1 and 1A clearly depict the PASS 80 connected to the SCBA by intermediate pressure hose 24. Ex. 2, pp. 26-27. Other than that, the PASS 80 is separate unit. The PASS 80 described in the patent can be mounted on the intermediate pressure hose such that it can be snapped in place (or removed) using pins and slots. *Id.*, p. 36, col. 6, ll. 16-23.

22. Turning to the R-PASS, it is also depicted as a separate unit 108 in Figure 1A. The only connection shown is via cable 82 to the PASS. In the Figure, the R-PASS appears to be simply hanging by that over-the-shoulder cable 82. This is consistent with the description which provides only for snap loops 86 for securing the cable 82 and the intermediate pressure hose. *Id.*, p. 35, col. 4, ll. 21-23. I see no description in the patent of any way to attach the R-PASS itself to the SCBA. As depicted and described, the PASS and R-PASS can clearly be removed simply by unsnapping snap loops 86 securing cable 82 and disconnecting the PASS from the intermediate pressure hose. It is unclear from the specification how easy it is to disconnect the PASS from the pressure hose or from the R-PASS. In practice, it is hard to imagine that the R-PASS would not be clipped on to the user in some fashion (*see,* Ex. 4, p. 81, col. 3, ll. 9-19), but that is not what is shown or described. In the situation described in the patent where the communication between the PASS and R-PASS is wireless, or where the R-PASS is an independent unit, the R-PASS would not hang by a cable and would need to be clipped on somehow, although again that is not addressed. At a minimum, I find it clear from the specification that the only meaningful connection described between the R-PASS and the PASS or SCBA, is the communication link

Case No. SACV08-01010 AG (MLGx)
80747913.2
- 8 -
AFFIDAVIT OF JAMES S. JOHNSON

with the PASS (which could be a cable or could be wireless) when the R-PASS is in a slaved relationship. Other than that, the R-PASS is separate and distinct from the PASS, and certainly from the SCBA.

23. The R-PASS is further described in the specification as a separate unit which "incorporates various portions for providing the remote sounding alert system." Ex. 2, p. 36, col. 6, ll. 53-55. The various portions of the R-PASS are further described. For instance, "[w]ithin the R-PASS 108 is a battery housing 304, having spring contacts 306 and 308. A battery 310 is provided to power the R-PASS 108." *Id.*, p. 37, col. 7, ll. 11-13. The R-PASS also has a "circuit board 298." *Id.*, col. 7 ll. 22-24. Finally, "connected to the circuitry on the board 298 and the power is a piezoelectric sounder or alarm 360 that is integral with the cover." *Id.*, col. 7, ll. 33-35.

24. While it is depicted as connected and slaved to the PASS, the specification also states that the R-PASS "can be effectively an independent unit like the PASS 80 so that it functions and can be controlled remotely or independently by an emergency worker or fireman. ..." *Id.*, col. 7, ll. 5-6. Thus, the other configuration option described is an even more separate unit, essentially a second stand-alone PASS. Although it is not described, in order to be a completely independent unit, the R-PASS would also have to have a motion sensor and panic button.

25. Finally, I note that the R-PASS is "driven by its own battery as far as its separate piezoelectric sounder is concerned." *Id.*, p. 38, col. 9, ll. 19-20. In addition, with reference to Figure 10, the R-PASS is described as having its own low battery warning system with "separate low battery signals" from the PASS.[1] *Id.*, col. 9, l. 50 – col. 10, l. 4. This further confirms that the R-PASS is separate from the PASS in all respects except that, if slaved to the PASS, there is a communication link for the PASS to turn the R-PASS on and tell it when to sound an alarm.

26. In light of these observations it is my opinion that a person of ordinary skill in the

---

[1] I note that the PASS and R-PASS are described as having LEDs. One use of these is for emitting a low battery warning signal, consistent with the requirements of the NFPA. Another use is as a visual indication of the location of a downed fire-fighter, which is often useful in the loud and smoky environment often encountered. In those conditions, lights are sometimes more effective than sound. Most PASS devices have both.

Case No.  SACV08-01010 AG (MLGx)          - 9 -          AFFIDAVIT OF JAMES S. JOHNSON
80747913.2

1  art at the time of the invention would define a PASS in accordance with its basic function and the
2  key structural components necessary to achieve that function.  Thus, I agree with Draeger's
3  proposed definition.  Regarding an R-PASS, as noted above this is a term coined in the '331
4  patent.  As far as I am aware, a person of ordinary skill in the art could not find this term
5  elsewhere, and would need to look at the patent to find its meaning.  At most, a person of skill in
6  the art would think an R-PASS was a PASS that is remote – a second PASS device.  As I have
7  discussed, the specification essentially confirms that was how the inventors used the term.  Thus,
8  it is my opinion that such a person would also define R-PASS in accordance with its basic
9  function and the key components necessary to achieve that function as described in the '331
10 patent.  Accordingly, I agree with Draeger's proposed construction of R-PASS as well.

11      27.    Perhaps the most relevant factor to capture in any definition is that there is no
12 question the R-PASS as shown and described in the '331 is completely separate and distinct from
13 the PASS, and there is no suggestion anywhere in the patent that it could be otherwise.  Apart
14 from the potential for a communications link if the R-PASS is slaved to the PASS, a person of
15 ordinary skill in the art would understand that the R-PASS has no commonality with, or shared
16 components or functionality with, the PASS.  This would make perfect sense in light of the NFPA
17 requirements for water and heat testing, low battery warning signal, and the need for a separate
18 battery compartment within the PASS.  A person of ordinary of ordinary skill in the art would
19 assume the R-PASS would be designed as it is described in the '331 patent in order to meet these
20 same requirements.  I note that the apparent commercial embodiment of the patent, the
21 COMPASS PASS with the DoublePASS, appears to have been designed this way.  Ex. 10, pp.
22 331-332 and Ex. 11.

23      28.    I also do not believe that a person of ordinary skill in the art would define a PASS
24 as any "system for warning others that a user may be in danger," and an R-PASS as a "remote
25 system for warning others that a user may be in danger," as Sperian has proposed.  These
26 definitions are correct in that the basic function of a PASS (or R-PASS) is to warn others, or in
27 Draeger's definition to alert others.  However, these definitions simply call for a "system" with no
28 definition of what the system is.  I do not even understand this definition to require detection of

user immobility with a motion sensor. It could be any warning for any danger, which is not consistent with the meaning of PASS to one of skill in the art. It also could be electronic, or not. The warning doesn't even have to be audible or visual under this definition. Even the NFPA, while attempting to remain design independent in its most generic definition, provides much more detail than this, namely, "[d]evices that are certified as being compliant with this standard, that sense movement or lack of movement, and that automatically activate an audible *alarm signal* (which can also be manually activated) to alert and to assist others in locating a fire fighter or emergency services person who is in danger." Ex. 3, p. 47, section 1-3.

29.  Even PASS devices long prior to the 1998 Edition of the NFPA 1982 standard had a motion sensor, circuit board, sounder and battery. I am not aware of a PASS device without these components. While the specific implementation could vary, a person of skill in the art would expect these components, as described in the NFPA standards and the patent.

30.  Finally, I note that the only difference between a PASS and an R-PASS in Sperian's proposal is that the R-PASS is "remote." Other than that, a PASS is identical to an R-PASS. Assuming these are separate "systems" with one being entirely "remote" from the other, these definitions may capture that aspect of the definition of an R-PASS in the context of the '331 patent. Specifically, it is clear to me that a person of skill in the art reading the patent would see that the R-PASS is a separate, stand-alone unit, very similar to the PASS. The only exception is the potential for a communication link if the R-PASS is slaved to the PASS. The components of the PASS and R-PASS, however, are entirely separate, or in Sperian's proposed definition, "remote," from each other. Thus, while I agree with Draeger's proposal that the R-PASS is "separate and distinct" from the PASS, a definition that the R-PASS is "entirely remote" from the PASS might capture the same understanding of one of skill in the art reading the '331 patent.

### Adapted for mounting on a user

31.  Simply put, a person of ordinary skill in the art would view this language as describing an add-on to an SCBA (or even for use without an SCBA). In other words, an additional device that is not attached or "mounted," but that can be attached and removed by the user.

32. As described above, the entire '331 patent is directed toward what I have called a second-generation PASS device, namely, an integrated PASS that is automatically activated when the SCBA is activated. The patent does not directly describe what is involved in attaching or removing the PASS. However, it is clear that the only connection to the SCBA is to the intermediate pressure hose.

33. In the claims, this language is not used in connection with the PASS of course, but rather with the R-PASS. The R-PASS appears to be even more readily removable than the PASS. As explained above, it is depicted in Fig. 1A (Ex. 2, p. 27) simply hanging from cable 82, and there is no description of it being secured to the SCBA during use. It is clearly not a permanent or, in the words of the NFPA "nonremovable," component of the SCBA. Further, if the connection were wireless, the R-PASS would not even be connected by cable 82. It would be clipped on anywhere.

34. Obviously, the words themselves do not say "mounted" but rather, "adapted for mounting." This is consistent with the specification and with the majority of PASS devices at the time, as discussed in the '305 patent which is cited on the face of the '331 patent-in-suit. Ex. 4, p. 81, col. 3, ll. 9-19. Accordingly, I agree with Draeger's proposal that "the R-PASS is a discrete device which is not attached, but is capable of being attached to the user."

35. Sperian's proposal is actually quite similar. The proposed language "suitable for attaching to equipment worn by a user" captures the basic point that the R-PASS is not permanently attached, but can be attached. Sperian also adds that the R-PASS can be attached to "equipment worn by the user" as opposed to just "a user" as recited in the claim. To me this appears to add something that is not even shown in the patent, unless the "equipment" the R-PASS can be attached to is the PASS via cable 82. However, I could read Sperian's definition as clarifying that the R-PASS does not come attached to the PASS or the SCBA. Rather, it is merely "suitable for attaching" to the PASS (and perhaps clipping to the SCBA or clothing, although that is not described). This would be consistent with the meaning of this claim language to one of skill in the art at the time of the invention, and in light of the NFPA definition of removable and nonremovable PASS.

### A different location

36.  A person of ordinary skill in the art would probably not think these words require much further explanation. In my opinion, "a different location" in any context simply means not the same location. In this case, the R-PASS is adapted for mounting in a location that is not the same as the PASS. As previously discussed, these are two separate units, so of course they do not occupy the same physical space.

37.  Nevertheless, because there is a disagreement, I have analyzed these words in the context of the patent specification. I do not see use of the words "a different location" anywhere but in the claims. The specification does use the word "location" in connection with the R-PASS twice. The Abstract states that the R-PASS "is attached to a location remote from the PASS." Ex. 2, p. 25. Of course, the claim language does not say "remote location" but rather, "a different location." *Id.*, p. 38, col.10, ll. 64-65.

38.  The specification later states that having the R-PASS in full alarm mode, "effectively causes the sounding of the full alarm in a second location." *Id.*, p. 38, col. 9, ll. 21-23. Thus, even the specification is not focused entirely on a "remote" location, but also a "second" location, which seems closer in meaning to "a different location."

39.  I further note that the language concerning the R-PASS, "and adapted for mounting on a user at a different location from said PASS," was added to the claims. Ex. 5, p. 162 (Answer to First Office Action). The examiner had rejected the claims because the prior Lenz patent showed a PASS with an alarm that also sent a signal to the command station to warn others – a remote alarm. The patent applicant explained that the new claim language excluded this option because the R-PASS must be "adapted for mounting on a user." *Id.*, p. 167. As the applicant explained, "[t]he invention is fundamentally directed toward the concept of having a sound emanate in proximity to the user." *Id.* Thus, "the location of the R-PASS at a point different from where the PASS is, <u>but on the user's body</u> alerts others in the user's proximate location." *Id.*, p. 168.

40.  I note that there was no discussion of what precise location. Reading the explanation of this new language, two things are clear. First, the R-PASS must be on the user,

Case No. SACV08-01010 AG (MLGx)
80747913.2

- 13 -

AFFIDAVIT OF JAMES S. JOHNSON

and not at the command station. Second, the R-PASS must be "at a point different from where the PASS is." *Id.* In my opinion, Draeger's definition captures these points such that a different location is "any position on the user that is separate and distinct" from the PASS.

41. Sperian's proposed definition of "a different location" is "a different side of the user." Essentially, Sperian does not define different, and replaces "location" with "side of the user." I can find no reference to "side of the user" in the claims, specification or file history.

42. The specification does of course describe and show in the Figures the preferred embodiment with the PASS on the front of the user and the R-PASS on the back. It also describes the invention more broadly. For instance, "this invention is a significant step in PASS technology to allow for multiple alerts in the eventuality one alarm or the other is muffled or covered." Ex. 2, p. 34, col. 2 ll. 60-62. Also, "[i]t should be further understood, that multiple R-PASS's can be used at other body locations." *Id.*, p. 38, col. 10, ll. 9-10.

43. Most significantly to me though, are simply the words of the claims. The claims do not say that the PASS is on the front and the R-PASS is on the back of the user. The claims do not say that the PASS and R-PASS are on opposite sides of the user. They simply say that the R-PASS is adapted for mounting on a user in different location from the PASS.

44. In my view, the simple fact that the R-PASS is not "mounted", but rather "adapted for mounting," leaves some discretion for the precise location. The NFPA recognized at the time that different PASS devices might be mounted in different locations, and provided that the manufacturer shall provide with the PASS the "[p]referred mounting position and orientation for optimal performance." Ex. 3, p. 51, section 3-2.4. The cited references confirm what one of skill in the art would know: that other locations were already known and in use for PASS devices including on the helmet, mask, shoulder or hip (waist). *See* Exs. 6-8, U.S. Patents 5,757,273 and 5,492,110 (hip or waist); 5,990,793 (mask); *see also* Ex. 9, uncited reference 5,564,128 (helmet). In fact, the '305 patent describes different attachment methods including a "grip clip" which "permits attaching the pass device to clothing, belts or harnesses." Ex. 4, p. 81, col. 3, ll. 14-16. Thus, virtually any location on the body is possible. A person of ordinary skill in the art would conclude that "a different location" would cover any of these locations, or any other location

preferred by the manufacturer.

45. Finally, I am mindful that the specification generally describes the problem to be overcome as muffling of the PASS. The file history further points this problem out, but indicates that the problem is solved by having "the location of the R-PASS at a point different from where the PASS is, <u>but on the user's body</u>." Ex. 5, p. 168. Practically any combination of the different locations I referenced above that were known at the time could address the problem of muffling. For instance, one PASS on the waist and the R-PASS on the helmet would address the problem, but would not be on "a different side of the user." Thus, the choice to use the words "a different location" would seem to a person of skill in the art as an intentional attempt to claim the invention broadly to cover those possibilities. Once again, this observation would favor Draeger's construction, not Sperian's.

### Signal Source / Audio Alarm / Audio Alert

46. The claims do not use terminology consistently. For instance, in the specification there are at least two types of signals: 1) communication signals from the PASS to the R-PASS, and 2) audio or visual signals from the PASS or R-PASS to the user or to others. In claim 1 it seems likely that the claimed "signal" refers to an audio or visual signal to the user or to others as is described throughout the patent. In claim 8 a "signal source" does not refer to and an audio or visual signal, but rather to the source of a signal from the PASS to the R-PASS.

47. Similarly, in claim 8 "audio alarm" is used to describe a structural component of a PASS or R-PASS – the sounder. Ex. 2, p. 38, col. 10, l. 61. It is also used to mean the same thing as an audio "signal" as the word "signal" is used in Claim 1. *Id.*, col. 10 l. 67. Further, in claim 6, which depends from claim 1, the term "audio alert" is used. *Id.*, col. 10, ll. 52-53. I would think this would mean an audible signal to the user or to others, but in the context it is used – <u>in said PASS and R-PASS</u> – it apparently means the structural component of a PASS or R-PASS – the sounder. This is confusing at best, especially because all PASS devices have a sounder.

48. The signals, or audio alarms, must further be understood in the context of PASS technology. The specification explains in great detail how a PASS functions in terms of issuing audible pre-alerts to the user, and finally a louder and different full alarm to warn others if the

user does not respond. *Id.*, pp. 37-38, col. 8, l. 28- col. 9, l. 49. This is in line with the NFPA standards requiring pre-alarms followed by a full alarm signal. Ex. 3, pp. 52-53, sections 4-3.2, 4-3.3, 5-1.1, 5-1.2. Under the standard, you cannot have a "PASS" without the pre-alarms and the full alarm signal. A person of ordinary skill in the art would certainly understand that for a PASS or an R-PASS you cannot warn others that a user is in danger without a full alarm. In addition, the claimed alarm is in connection with the R-PASS. In the specification, the R-PASS is only described as issuing visual pre-alerts. Ex. 2, p. 37, col. 7, l. 30. The only audible signal described is the full alarm signal. Thus, in my view, the audio alarm (or sound made by the audio alert) must be, or at least include, the full alarm signal as Draeger has proposed.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 15 day of May, 2009.

By: *James S. Johnson* (signature)
James S. Johnson

SEE ATTACHED
ACKNOWLEDGEMENT

05/15/09

# CALIFORNIA ALL-PURPOSE CERTIFICATE OF ACKNOWLEDGMENT

**State of California**
**County of** ALAMEDA

On 05/15/09 before me, SUNIL DHIR, NOTARY PUBLIC personally appeared JAMES SMITH JOHNSON who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the state of California that the forgoeing paragraph is true and correct.

_____
Signature of Notary

[Notary Seal: SUNIL DHIR, COMM. #1597108, Notary Public-California, ALAMEDA COUNTY, My Comm. Exp. July 24, 2009]

### Optional Information

Date of Document: 05/15/09

Type or Title of Document: AFFIDAVIT

Number of Pages in Document: 17

Document in a Foreign Language: _____

**Type of Satisfactory Evidence:**
____ Personally known with Paper Identification
____ Paper Identification
____ Credible Witness(es)

**Capacity of Signer:**
____ Trustee
____ Power of Attorney
____ CEO/CFO/COO
____ President/Vice-President/Secretary/Treasurer
____ Other: _____

**Other Information**
_____
_____
_____
_____
_____

2009 Version  925 416-1156  www.NotaryClass101.com